Receipt number AUSFCC-7235525

## IN THE UNITED STATES COURT OF FEDERAL CLAIMS

THE CONFEDERATED TRIBES OF THE
COLVILLE RESERVATION,

Plaintiff,

  v.

No. _   **21-1664 L**

THE UNITED STATES OF AMERICA,

Defendant.

## COMPLAINT

Plaintiff, by and through the undersigned attorney, for its Complaint against the United States, hereby alleges as follows:

INTRODUCTION

1.      This is an action by Plaintiff, the Confederated Tribes of the Colville Reservation ("Colville Tribes" or "Tribes"), seeking money damages against the United States of America ("United States" or "Government") for breaches of fiduciary duties by the United States, acting by and through its past and current federal agencies and officers, as trustees and trustee-delegates of land, timber, roads and other assets held by the United States for the benefit of the Colville Tribes.  This action arises out of the Government's breach of statutory, regulatory, and common law trust duties owed to the Colville Tribes relating to the Tribes' forests and catastrophic forest fires that severely damaged resources held in trust for the Tribes.

2.      The United States' breaches, which resulted in the largest loss of board feet of timber of any fire event on any Indian reservation in recorded history, are in many forms.  The United States failed to fund or carry out adequate fuels management, such as prescribed fires and

1

thinning.  This led to tinderbox conditions in which catastrophic fire was inevitable.  The United States also did not adequately prepare for wildfire.  Required fire prevention systems and measures were not in place, such as fuel breaks and early fire identification and suppression systems.  Once the fires grew, the United States failed to provide adequate suppression resources, and diverted scarce resources from the Reservation to protect off-Reservation vacation homes and other areas.  Widespread failure to maintain forest roads exacerbated every aspect of fire management, including severely limiting access for fuel management, fire prevention, and fire suppression.  After the fires were finally out, the United States failed to take the required measures to restore roads, protect sacred water resources, rehabilitate soils, replant forests, and promote healthy reforestation.  Because of the severity of the burning, the failure to restore forests has set back the development of healthy forests and timber production for decades, or in some instances, indefinitely.  The failure to restore forests has also exacerbated harm to water quality and quantity, soils, wildlife, fisheries, and cultural resources.

3.      A series of reports prepared by independent experts on behalf of the United States identified systemic lack of fuels management and fire prevention on Indian lands, including the Colville Reservation, as breaches of trust and a pressing threat to Tribal resources and public safety.

4.      The North Star fire ignited in mid-August, 2015.  The fire burned on the Colville Reservation for 57 days, during which time the Tunk Block fire, which was partially on-Reservation, also raged.  In total, the wildfires burned more than 590 square miles, including more than 800,000,000 board feet of the Tribes' valuable commercial timber.  The lost timber represented approximately 20 percent of the commercial timber on the Reservation.  In many areas the fires burned so hot that they sterilized the soil and created a moonscape.  The area

consumed by fire was more than eight times greater than the geographic area of the District of Columbia.

5.      Since the North Star and Tunk Block wildfires, wildfires have continued to occur on the Reservation.  The Tribes are contending with major fires at the time of the filing of this Complaint.  In the summer of 2021, more than 60,000 acres have already burned, before the typical height of fire season.

6.      Wildfire is a regular natural phenomenon.  However, the United States' breaches of trust relating to the Tribes' forests greatly increased the opportunity for, and the size and severity of, the North Star, Tunk Block, and other fires on the Reservation.  In the summer of 2015, the Tribes lost roughly twenty percent of the commercial timber on the Reservation, and those losses have increased in the years following.

7.      Individually and cumulatively, the United States' breaches of trust related to forest conditions, road maintenance, fire prevention, fire suppression, and post-fire rehabilitation caused extensive damage to the Tribes and its trust resources, including commercial forests, soils, water, fisheries, and cultural resources.

<u>PARTIES</u>

8.      Plaintiff is a federally recognized Indian tribe organized pursuant to Section 16 of the Indian Reorganization Act of 1934, 48 Stat. 987 (codified at 25 U.S.C. § 5123).   Pursuant to the Act, the Tribes adopted a Constitution, which established its Business Council as its governing body.  The Constitution and associated by-laws were approved by the United States government on February 26, 1938.  The Tribes amended their Constitution multiple times, most recently in 1990 and, to correct a typographical error, in 2014.  Accordingly, the Tribes possess

all legal rights afforded to federally recognized Indian tribes.  The Tribes occupy the Colville Reservation in eastern Washington.  The Tribes have approximately 9,429 enrolled members.

9.      Defendant trustee United States, acting by and through the Department of the Interior, the Department of the Treasury, and other past and present federal agencies and their officers, as a matter of federal statutory, regulatory, and common law, is trustee and a fiduciary to the Colville Tribes and is charged with carrying out trust duties and responsibilities with regard to the management and administration of assets held in trust for the use and benefit of the Tribes.  The Secretary of the Interior, as the principal agent of the trustee United States, has continuously reaffirmed that the trust responsibilities of the United States to the Tribes are well-established, originated with the formation of the United States Government, and are an ongoing obligation.

10.     Secretarial Order No. 3335 § 3a (Aug. 20, 2014) states that "[t]he trust responsibility consists of the highest moral obligations that the United States must meet to ensure the protection of tribal and individual Indian lands, assets, resources, and treaty and similarly recognized rights."  The January 26, 2021, "Memorandum on Tribal Consultation and Strengthening Nation-to-Nation Relationships" issued by President Joseph R. Biden, Jr., reaffirms that "[i]t is a priority of my Administration to make respect for Tribal sovereignty and self-governance, commitment to fulfilling Federal trust and treaty responsibilities to Tribal Nations, and regular, meaningful, and robust consultation with Tribal Nations cornerstones of Federal Indian policy.  The United States has made solemn promises to Tribal Nations for more than two centuries.  Honoring those commitments is particularly vital now, as our Nation faces crises related to health, the economy, racial justice, and climate change — all of which disproportionately harm Native Americans."

JURISDICTION

11.    This Court has jurisdiction over the subject matter of this civil action under the

Indian Tucker Act, 28 U.S.C. § 1505, and the Tucker Act, 28 U.S.C. § 1491(a)(1), because the

action involves a claim against the United States for money damages brought by an Indian tribe

residing within the territorial limits of the United States, and arises under the Constitution, laws,

statutes, and regulations of the United States, agreements between the Tribes and the United

States, Executive Orders of the President, and federal common law, all of which govern the

administration and management of property held by the United States in trust for Indian tribes as

described herein.

12.    The Government has waived its sovereign immunity under 28 U.S.C. §§ 1491 and

1505.

13.    This Court has jurisdiction over the Tribes' claims.  As noted by the United States

Supreme Court, the Federal Circuit and this Court, courts have routinely asserted jurisdiction

over claims for money damages stemming from the government's mismanagement of tribal-

forest resources under forest management statutes.  *See United States v. Mitchell*, 463 U.S. 206,

222, 224, 226 (1983) (holding government accountable in money damages for alleged breaches

of trust in connection with management of forest resources held in trust) ("*Mitchell II*");

*Confederated Tribes of the Warm Springs Reservation v. United States*, 248 F.3d 1365, 1370-71

(Fed. Cir. 2001) (finding the government breached fiduciary duties in managing tribal forest

land); *Apache Tribe of Mescalero Reservation v. United States*, 43 Fed. Cl. 155, 162-63 (1999)

(same); *Navajo Tribe of Indians v. United States*, 9 Cl. Ct. 336, 344-45 (1986) (same); *The

Blackfeet Tribe of the Blackfeet Reservation v. United States*, Case No. 12-429L, ECF No. 62

(Fed. Cl. Aug. 21, 2015)).

ALLEGATIONS

*The Colville Confederated Indian Tribes and the Colville Reservation*

14.     Twelve culturally distinct Bands compose the Confederated Tribes of the Colville

Reservation: Chelan, Chief Joseph Band of Nez Perce, Colville, Entiat, Lakes, Methow, Moses-

Columbia, Nespelem, Okanogan, Palus, San Poil, and Wenatchi. The traditional territories of the

Tribes extend across eastern Washington and into portions of British Columbia, Oregon and

Idaho.

15.     The Colville Reservation was established by Executive Orders and an Act of

Congress, including Executive Order of April 9, 1872, and Executive Order of July 2, 1872.  As

established by these Executive Orders, the Colville Indian Reservation consisted of all lands

within Washington Territory bounded by the Columbia and Okanogan Rivers, extending

northward to the U.S.-Canadian border and encompassed approximately three million acres.

16.     The present-day Colville Reservation boast tremendous natural resources, rich

ecosystems, and stunning scenery.  As detailed in the Integrated Resources Management Plan

currently in effect for the Reservation, the forest-type category of land classification totals almost

two-thirds of the Reservation land area. Open rangeland and forested rangeland account for

almost one-third of Reservation lands with residential, agricultural, and surface water comprising

the remainder.

17.     The Colville Tribes rely on sound management of the Reservation's resources to

sustain the Tribes' way of life and economy in perpetuity.

18.     The Reservation contains a variety of natural and renewable resources, including

timber. There are more than 913,000 forested acres on the Reservation, of which approximately

652,308 acres are commercial forest in various stages of growth.  The Reservation's commercial

forests are the Tribes' single largest asset.

19.     The Tribes' trust lands and natural resources are of enormous economic

importance to the Tribes. The Tribes rely on its lands and natural resources to generate revenue

for the Tribes, to provide employment for Tribal members, to provide cultural and natural

benefits, and to serve as a self-sustaining permanent homeland.  If managed correctly, the

Reservation's natural and renewable resources would sustain the Tribes and its members into the

foreseeable future.

20.     The Tribes' trust lands and natural resources are also of enormous cultural and

spiritual importance to the Tribes.  For the Tribes, natural resources are cultural resources.

Tribal members hunt, fish, and gather food and other resources on the Reservation.  Water

quality and quantity are critical, with Tribal members placing a high value on being able to drink

from streams.  Culturally significant plants are gathered for food, medicine, and ceremonial

purposes.  Tribal members also value locations of cultural and spiritual significance on the

Reservation.

*The United States' Fiduciary Obligations*

21.     The long-standing trust relationship between the United States and the Colville

Tribes, and the fiduciary duties assumed by the United States, are rooted in and derived from

multiple statutory and regulatory provisions governing the administration of trust assets.

22.     The Tribes' land, and the timber and other resources on and under its land, are

held in trust by the United States and are inalienable except as authorized by Congress.  25

U.S.C. § 177.  The United States exercises control over natural resources on and under the

Tribes' land and has a trust obligation to appropriately manage the natural resources located

within the boundaries of Indian reservations and trust lands.  Congress delegated to the Secretary

of the Interior the authority and responsibility to oversee the use of Tribal lands and the

associated timber and other natural resources.  *See* 25 U.S.C. §§ 3101 through 3120 ("National

Indian Forest Resources Management Act" or the "NIFRMA"); *see also* 25 U.S.C. § 162a(d)(8)

(stating general trust responsibility with respect to natural resources).

23.     The statutes and regulations describing the United States' duties in managing

tribal land, timber and non-monetary assets create specific fiduciary duties that mandate

compensation for damages sustained as a result of the breach of the duties imposed. *See, e.g.*,

*Mitchell II*, 463 U.S. at 224, 226.

24.     The United States, through the Secretary of the Interior, has managed the Tribes'

land, timber, and other non-monetary assets.  The United States' control and management of the

Tribes' trust property as described herein has existed from at least 1871 to the present.

25.     Because the United States holds tribal land and resources in trust, it has assumed

the obligations of a trustee.  *United States v. White Mountain Apache Tribe*, 537 U.S. 465, 475-

76 (2003); *Mitchell II*, 463 U.S. at 224-26; *Jicarilla Apache Nation v. United States*, 100 Fed. Cl.

726, 731-32 (2011); *see also* 25 U.S.C. § 3101(2) (Congress has acknowledged that "the United

States has a trust responsibility toward Indian forest lands").

26.     As trustee, the United States has a fiduciary relationship and obligations of the

highest responsibility to administer the trust with the greatest skill and care possessed by the

trustee; its conduct "should therefore be judged by the most exacting fiduciary standards." *Cobell*

*v. Norton*, 240 F.3d 1081, 1099 (D.C. Cir. 2001) (quoting *Seminole Nation v. United States*, 316

U.S. 286, 297 (1942)); *Shoshone Indian Tribe v. United States*, 364 F.3d 1339, 1348 (Fed. Cir.

2004); *Jicarilla Apache Nation v. United States*, 112 Fed. Cl. 274, 287 (2013).  These fiduciary

obligations include, among other duties, ensuring that tribal trust property is protected, preserved and managed so as to maximize the trust income to the beneficiary by prudent investment. *Jicarilla Apache Nation*, 112 Fed. Cl. at 289.

27.     It is well-settled that the United States has fiduciary responsibilities in managing Indian-owned forest land. *See Mitchell II*, 463 U.S. at 210, 226  (holding the government has a fiduciary responsibility to manage allotted forest land consistent with the principles of sustained yield); *The Confederated Tribes of Warm Springs Reservation*, 248 F.3d at 1370  ("[T]he United States has a fiduciary responsibility to manage those timber resources based upon a consideration of the needs and best interests of the Indian owner and his heirs.") (internal quotation marks and citations omitted).

28.     The United States has a fiduciary responsibility to manage those timber resources "based upon a consideration of the needs and best interests of the Indian owner and his heirs," including "the need for maintaining the productive capacity of the land for the benefit of the owner and his heirs," 25 U.S.C. § 406(a), and the proceeds from the sale of timber harvested from the reservations must be used for the benefit of the Indians or transferred to them, *see id*. §§ 406, 407. The Secretary of the Interior is directed to adhere to principles of sustained-yield forestry on all Indian forest lands under government supervision, *see Mitchell II*, 463 U.S. at 209, and to manage the forested reservation land so as to ensure that the Indians receive "the benefit of whatever profit [the forest] is capable of yielding," *White Mountain Apache Tribe v. Bracker*, 448 U.S. 136, 149 (1980).  *See also* 25 USCS § 5109 (directing regulation of sustained yield management); 25 USC § 318a (authorizing appropriations for roads); 25 U.S.C. § 162a(d)(8).

29.     Congress built upon and detailed the government's fiduciary responsibilities related to the management of tribal forest land when it enacted the NIFRMA in 1990.   Through

NIFRMA, Congress directed Interior to ensure "the development, maintenance, and enhancement of Indian forest land in a perpetually productive state in accordance with the principles of sustained yield and with the standards and objectives set forth in forest management plans." 25 U.S.C. § 3104.  In addition to related statutes governing forests and forest road management on the Colville Reservation, NIFRMA and its implementing regulations impose comprehensive, money-mandating duties to manage the forests and forest roads on the Colville Reservation.  The United States, through the Secretary of the Interior, promulgated numerous regulations that generally and specifically describe the Government's duties in managing the Tribes' land, timber, and other non-monetary assets including without limitation 25 C.F.R. Part 163, and the predecessors to those regulations.  Applicable regulations include 25 C.F.R. § 163.28, which authorizes the Secretary of the Interior to expend funds to prevent wildfire, restore forest conditions post-fire, and to use fire as a management tool on Indian reservations.

30.     The United States breached the above duties owed to the Tribes, resulting in substantial losses to the Tribes.

*Forest Background*

36.     The Tribes have a robust tradition of managing timber for economic, environmental, and cultural benefit.  While the Tribal forestry department has taken on some aspects of forest management, the Tribes' management has been hampered in important respects by the systemic failures of the United States to fulfill its fiduciary obligations to the Tribes.

37.     Beginning with the enactment of NIFRMA in 1990, Congress required the Secretary of the Interior to obtain periodic independent assessments "of Indian forest lands and Indian forest land management practices." 25 U.S.C. § 3111(b).  Under 25 U.S.C. § 3111, reports were prepared in 1993, 2003 and 2013 by the Indian Forest Management Assessments Team

("IFMAT"), a team of nationally recognized and independent forestry experts.  IFMAT found

that the United States failed to fulfill its trust obligations to Indian forestry generally.  *See, e.g.*,

IFMAT-I at ES-5 (Nov. 1993) ("Indian forestry is seriously underfunded and understaffed

compared with forestry on similar federal and private lands"); IFMAT-II at 6 (Dec. 2003)

("Little progress has been made in overcoming the major shortcoming of trust oversight of

Indian forests by the federal government"); IFMAT-III at Vol. I, p. 9 (2013) ("the federal

government continues to inadequately fulfill its trust obligations to Indian forestry . . .").

38.     Each of the IFMAT reports included visits to and review of the Colville

Reservation and forest conditions on the Reservation.

39.     The IFMAT-III report concluded that the United States' trusteeship of Indian

forests is underfunded, understaffed, and provides insufficient technical support for Indian

forestry operations.  IFMAT-III at Vol. I, pp. 7, 36, 41, 42, and 45.  The report concludes that

"the federal government continues to inadequately fulfill its trust obligations to Indian forestry as

identified by Congress in the preamble to NIFRMA (Title III Sec 302)."  *Id.* at 9.

40.     IFMAT III specifically identified the well-known and growing threat of

catastrophic fire resulting from inadequate fuel reduction and forest management.  The report

states that "[t]he health of tribal forests is threatened by density-related issues such as wildland

fire, insects, and disease, which will increasingly compromise long-term forest sustainability.

This is especially the case in the dry West where much of Indian forest acreage is.  Thinning

backlogs (for stand improvements such as precommercial thinning) on tribal forest lands are

estimated by the BIA to total 440,000 acres. This does not include the tens of thousands of acres

on which hazardous fuel reduction treatments are needed. If land managers are going to use fire

as a tool to restore ecosystems and reduce landscape level fuel accumulations, they need to be

treating five to ten times the amount of acres they have been treating annually over the last decade." IFMAT-III at Vol. I, p. 6.

41.     IFMAT III further anticipated that "[a]dding urgency to these risks are climate change; personnel shortages; the widespread loss of harvesting, transportation, and processing infrastructure; and adjacent forest ownerships that are densely stocked in many locations, posing increased wildfire threats to tribal resources." IFMAT-III at Vol. I, p. 7. Detailed budget review demonstrates that for decades the United States has provided significantly less funding per acre for hazard fuel reduction and other forest management on Indian lands than on other regional forest lands. "IFMAT III finds that federal forestry funding for Indian forest lands still lags forest land investments on the federal forests (National Forests and BLM), state forests and private lands, particularly in the West." IFMAT-III at Task A 89.

42.     Roads are integral to forest management, fire prevention, and fire suppression. Road maintenance on Indian lands is chronically underfunded, as documented in IFMAT I, II, and III. IFMAT III states that "road infrastructure in-forest and out-of-forest is poor in Indian Country, with reportedly only 16% of the [BIA roads] functioning at acceptable or better levels." IFMAT-III at Task A 79.

43.     The United States' breaches of fiduciary duty to tribes described in the IFMAT reports also occurred on the Colville Reservation. As part of IFMAT III, the IFMAT team prepared a site report for the Colville Reservation ("Site Report"). The Site Report was prepared in part by the co-chairs of IFMAT.

44.     The Site Report describes a systemic lack of funding from the United States to fulfill trust responsibilities to the Colville Tribes, and specifically details failures with respect to forest health, fire prevention, and fire suppression:

Programmatic funding has been undergoing steady decline. The Tribe competes for soft-money grants which are used to help meet planning and operation costs. The fire management program has many shortfalls and disparities in funding including planning, wildland fire suppression, protection of the wildland urban interface and hazardous fuels reduction needs that if not addressed in the next 12 to 18 months is expected to have significant impacts on the Colville management of their lands. Tribal foresters report that the Department of Interior Hazardous Fuels Priority Allocation System (HFPAS) has serious modeling flaws that have resulted in significant shifts in national funding priorities that have created swift funding cuts for tribes such as the Confederated Colville Tribes (CCT).

Site Report at 3.

45.     The Site Report also describes poor road maintenance as follows: "overall the roads on the Reservation are in need of maintenance, road abandonment, bridge and culvert installation and improvements in fish passage. Funding for roads, culverts and water structures are lacking and a road plan needs to be completed." Site Report at 2.

46.     In addition to inadequate funding, the Site Report describes chronic staffing shortages. The Site Report states that "[i]t is difficult to fill job vacancies and it can take up to 12 months just to get key positions posted since BIA human resources office was moved to Oklahoma." *Id.*

47.     The United States eliminated staff and funding necessary to fulfill its trust responsibilities, resulting in forest management, fire prevention, fire suppression, and fire rehabilitation not occurring or forcing the Tribes to take on management costs that must be borne by the United States.

*The North Star, Tunk Block, and Other Fires*

48.     The North Star Fire was reported on August 13, 2015, approximately 12 miles north of Nespelem, WA, on the Colville Reservation. The fire grew quickly using abundant logging slash and overstocked stands, along with dry grasses, as fuels. By August 14th, the fire had grown to 14,000 acres.

13

49.     Despite a large, growing wildfire over and near lands susceptible to catastrophic fire, necessary and anticipated additional fire suppression resources did not arrive to supplement the local firefighting workforce.  After 72 hours into the fire without any major suppression resources, the 118 local fire fighters were exhausted and hampered by extremely limited resources, steep terrain, rolling rocks and falling trees in an already unstable situation.

50.     A Type 2 Incident Management Team arrived on the evening of August 17th, more than three days into the fire.  At this point the North Star fire had burned more than 35,000 acres.

51.     The fire exhibited extremely dangerous behavior, including spotting (sparks carrying fire, sometimes for miles, to quickly spread), group torching (complete ignition of trees from heat), and uphill runs (accelerated spread up slopes).  On August 19, 2015, due to potential for new fire starts, limited firefighting resources, drought conditions, and extreme fire behavior, the Industrial Fire Protection Level on the Colville Reservation was raised to Level 4, "General Shutdown" to all activities.

52.     By August 21st the fire had grown to 126,000 acres and was at zero containment. On August 23rd, the fire was up to 147,000 acres with 448 personnel working.  By August 26th, the fire was at 155,000 acres.  Extreme smoke conditions pervaded the Reservation and the public was advised to stay indoors.  The Tribes distributed smoke masks to their members.

53.     The Colville Tribes did not receive any air tanker or other major federally deployed suppression resources until the North Star fire exceeded 100,000 acres.  Conversely, federal authorities deployed federal suppression resources to other fires in the area that were not burning federal trust property, including the Colville National Forest.

14

54.     It was not until August 26th, almost two weeks after the North Star fire started and after vast amounts of timber held in trust had burned, that fire fighters from the National Guard and U.S. Army began arriving to assist crews on some of the fires.  On August 27th, the crews were up to 731 personnel.

55.     By September 1st, the North Star Fire had finally moved up in priority as the number one fire in the nation and available personnel increased the work force to 1,444 people. By September 5th, a change in the weather helped suppression efforts and containment increased to 35 percent.  By this time, the fire had burned through 208,145 acres.

56.     57 days after initial ignition, the North Star fire finally ended on October 8, 2015, having burned 165,000 acres on the Colville Reservation and 218,138 acres total.  It was the state's largest fire in 2015.

57.     To make matters worse, the Tunk Block fire started on August 14, 2015, and crossed onto the Reservation from state and federal land. Like the North Star fire, the Tunk Block fire encountered huge amounts of available fuel on the Reservation, and limited suppression resources were provided by the United States.  It burned for 64 days through timber, grass, shrubs, and logging slash and ultimately burned approximately 165,947 acres.  About half of the fire was within the Colville Reservation.  The Tunk Block fire ended October 15, 2015.

58.     Together the North Star and Tunk Block fires burned more than 240,000 acres on the Colville Reservation, with enormous damage to trust resources.  The fires burned at high intensity.  Collectively, the fires burned more than 590 square miles and more than 800,000,000 board feet of the Tribes' valuable commercial timber.  The lost timber represented approximately 20 percent of the commercial timber on the Reservation and was—and remains—the single

largest loss of board feet of timber on an Indian reservation in recorded history.  In many areas the fires burned so hot that they sterilized the soil and created a moonscape.

59.     Since the North Star and Tunk Block fires, there have been additional high intensity fires on the Colville Reservation that have damaged trust resources, including the Cold Creek Fire, Bridge Creek Fire and other fires, including fires burning at time of the filing of this complaint.  The United States' breaches of trust caused damages suffered by the Colville Tribes from these fires and greatly increases the opportunity for more large-scale devastating fires in the near future.

60.     Approximately one-third of the Tribes' commercial forest resources have been burned during the last six years because of fire events.  If the United States continues to breach the fiduciary duties owed the Tribes, the remaining commercial forest will be lost in the coming years.

61.     The following map depicts major fires that burned on the Reservation from mid-August 2015 through 2020.  The Reservation boundary is outlined in light grey, while the burnt areas are the darker shaded areas:



62.    The North Star, Tunk Block, and subsequent fires burned with incredible intensity and severity.  In areas lacking fuels treatment in the North Star fire, flame length exceeded 100 feet, which means that from ground to tip the fires were higher than a seven-story office building.  The fires repeatedly jumped miles at a time, created their own weather systems, and presented enormous risk to firefighters and the public.

63.    As detailed below, the United States' breaches of trust increased the opportunity for and the size, severity, and intensity of fires.  The United States' failure  to adequately restore the post-fire environment caused ongoing damages to the Tribes.  This complaint discusses some of the United States' breaches of its fiduciary duties.  The failure of the United States to account to or otherwise keep the Tribes informed about the condition and status of Tribal trust property prevented the Tribes from discovering the full extent of its claims.  The violations are described in detail herein, but form an illustrative rather than exhaustive list.

*The United States Breached Its Fiduciary Duties Relating to Fuels Management*

*and Forest Health*

64.     The United States failed to adequately manage fuels on the Colville Reservation and failed to maintain the health of the Tribes' forests.

65.     The United States failed to conduct adequate fuels management measures, including prescribed burning.  The United States' failures to reduce fuels resulted in extreme risk of catastrophic fire and contributed to the size and severity of wildfire on the Reservation.

66.     The United States imposed unreasonable limitations and restrictions on prescribed burning on the Reservation, which greatly impaired the ability of the United States and the Tribes to carry out adequate fuels management.

67.     The United States' breaches of trust increased the size and severity of the North Star and Tunk Block fires, with resulting damages to the Tribes.  The BIA conducted a Fuels Treatment Assessment—Northwest Region, published in 2015.  The Assessment determined that only 12,449 acres of the area burned by the North Star fire had previously undergone fuel treatment, thus comprising less than ten percent of the area burned.  Only 5,396 acres of the approximate 80,000 acres area burned by the Tunk Block fire on the Colville Reservation had previously undergone fuel treatment.  As with the North Star fire, the area subject to fuels treatments on the Reservation comprised less than ten percent of the area burned.

68.     Fuels treatments are effective at reducing the damage of fires.  The Tribes historically practiced indigenous burning to control catastrophic wildfire and enhance wildlife habitat.  Where fuels treatments have occurred on the Reservation, subsequent fires have burned with less severity and less damage to the Tribes' resources.

69.     The BIA Assessment of the North Star fire concluded that where treatments occurred, "[f]uels treatments composed of thinning followed by prescribed fire routinely reduced fire behavior and minimized negative fire effects."  Assessment at 12.  For example, the Clark Creek treatment consisted of mechanical thinning followed by broadcast burning over 1,100 acres.  The Clark Creek treatment was completed in 2011.  BIA documented that when the North Star fire entered the area covered by "the Clark Creek treatment, active crown fire with over 100-foot flame lengths changed to a surface fire, which also aided firefighter's ability to safely conduct more direct suppression tactics. By reducing the amount of vegetation on the ground, the highly-valued middle-aged to old-growth stands adjacent to the Clark Creek and Jim Creek and treatments were protected. Heavy thinning and pile burning along the Highway 155 corridor removed a lot of potential energy, so that when the fire did enter the treated area, there was little overstory mortality."  Thus, the limited treatments that occurred not only reduced fire severity, they helped to protect trust resources.

70.     The United States failed to address overstocking and lack of tree species diversity.

71.     The United States failed to conduct thinning operations necessary to accelerate commercial growth and prevent overstocking.  Precommercial, forest health, and hazard reduction thinning promote high value, large diameter trees that are more fire resistant.  In order to obtain maximum value from the Tribes' forest trust assets, thinning is necessary on hundreds of thousands of acres of the Tribes' commercial forests.

72.     The United States failed to conduct thinning operations and other treatments necessary to reduce fire risk.

73.    The United States failed to carry out thinning operations, uneven-aged management, and other measures necessary to protect and develop wildlife habitat, grazing, recreation, and cultural and aesthetic values.

74.    For example, the BIA prepared a 2005-2014 Plan for Integrated Resource Management ("IRMP"), which encompassed forest management through a Forest Plan.   With input from the Tribes, the BIA selected the Tribes' preferred alternative, "Alternative 7," for implementation.  The IRMP remains in effect because the United States has not approved a draft revised plan or completed the associated environmental review.  Alternative 7 prioritized fuels management and thinning.

75.    The plan sets a fuels management objective of 15 tons per acre and commits that "[t]he fuels management objectives of 15 tons per acre would be achieved by pile and burning, underburning, jackpot burning, or broadcast burning depending on the treatment and the amount of activity and natural fuels. Under this Forest Plan, 5,400 acres of non-harvest stocking control (thinning) and 6,400 acres of prescribed burning for non-harvest fuels management would occur annually."  IRMP at 68.   The United States did not fulfill these commitments.

76.    The Plan calls for a total of 11,100 acres of total thinning annually.  IRMP at 10. The Plan further states that "[p]re-commercial thinning will be approved," IRMP at 44, and that "[t]hinning will be used to prevent resource loss and maintain large trees as long as possible." IRMP at 45.  The United States did not fulfill these commitments.

77.    The Draft 2015 Integrated Resources Management Plan ("2015 IRMP"), which has not yet been finalized by the United States, also calls for forest managers to "[u]tilize prescribed fire as a tool to manage fuels, improve vegetation health, and plant community resilience," and to "[i]mplement thinning, manage stand structure, and shift species composition

to make stands more resistant & resilient to insects and diseases." 2015 IRMP at 92. With respect to wildfire, the 2015 IRMP calls for forest managers to "[m]anage fuel loadings to reduce the potential for wildfires that result in severe resource damage." 2015 IRMP at 95. The United States has not fulfilled these objectives.

78.     The United States' breaches of trust relating to forest health damaged the Tribes' forests and imposed costs on the Tribes that must be borne by the United States. The United States' breaches of trust relating to forest health caused the forests on the Reservation to pose an extreme fire risk, and increased the size, severity, and damage caused by the North Star, Tunk Block, and other fires.

*The United States Breached Its Fiduciary Duties Relating to Forest Roads*

79.     The United States failed to perform necessary road maintenance on forest roads, resulting in restrictions on access to forests for conducting forest management, fire prevention, fire suppression, and rehabilitation.

80.     NIFRMA provides that "the Secretary shall comply with tribal laws pertaining to Indian forest lands, including laws regulating the environment or historic or cultural preservation ..." 25 U.S.C. § 3108. In 1985, the Colville Tribes enacted its Forest Practices Water Quality Act ("FPWQA"), which prescribes comprehensive, detailed standards for the design, construction, and maintenance of forest access roads and culverts on forest land on the Colville Reservation. The IRMP incorporates the FPWQA by reference and its requirements are restated throughout. The United States did not fulfill its commitments to comply with the FPWQA and other Tribal laws relating to Indian forest lands.

81.     The BIA is aware that the forest roads on the Colville Reservation are not adequately designed to comport with applicable federal and Tribal standards. The BIA has never

had forest roads specialists employed within the agency.  The Tribes have devoted significant Tribal funding and staff resources to forest road maintenance and restoration over the past decade, in large part in an attempt to minimize damage caused by the United States' breaches of trust.

82.     Also, as noted above, the IFMAT III Site Report documented major concerns with forest roads, concluding that "overall the roads on the Reservation are in need of maintenance, road abandonment, bridge and culvert installation and improvements in fish passage."  Site Report at 2.

83.     The IRMP commits to "[n]o net increase in roads. Reduce total road density to desired future condition of 3.0 miles per sq. mile and open road density to 1.5 miles per square mile in 15 extremely sensitive watersheds."  IRMP at 10.  The United States did not fulfill these commitments.

84.     During the North Star and Tunk Block fires, inadequately maintained roads caused significant limitations in fire suppression.  Following the fires, inadequately maintained roads contributed to severe resource damage, including to water quality, soils, and fisheries.

*The United States Breached Its Fiduciary Duties Relating to Fire Prevention*

85.     The United States failed to conduct adequate fire prevention.

86.     The United States failed to provide adequate firefighting staff, resources, equipment, and fire detection systems.

87.     The United States did not construct sufficient fire breaks.

88.     The United States did not maintain an adequate level of readiness to meet normal wildfire protection needs and extinguish forest or range fires on the Colville Reservation, and did not provide adequate staff and labor for fire prevention.

22

89.     The United States' breaches of trust relating to fire prevention increased the size, severity, and damage caused by the North Star, Tunk Block, and other fires.

*The United States Breached Its Fiduciary Duties Relating to Fire Suppression*

90.     The United States failed to provide adequate fire suppression resources to curtail fire size, severity, and damage caused by the North Star and Tunk Block fires.  The United States allocated its resources to fires earlier in the fire season, to the detriment of the Tribes.

91.      The United States directed fire suppression resources to protect off-reservation, non-trust property as a priority over the Tribes' land and forests, which are held in trust status by the United States.

92.     In 2018, the Intertribal Timber Council, of which Colville Tribes are a member, prepared a report titled "Improving Efficiency, Equity and Effectiveness of Wildfire Impacts on Tribal Trust Resources."  The Report, in part based on experience in the North Star and Tunk Block fires, documented a systemic problem in which the United States provides limited fire resources that are allocated based on the timing of a fire in the fire season (early fires receive the first chance to request resources).  This incentivizes earlier fires to order extensive resources, and results in later season fires receiving delayed suppression resources.  For the North Star and Tunk Block fires, this resulted in a several days-long delay in delivery of fire suppression resources, which allowed the fires to grow massive and beyond control.

93.     The Intertribal Timber Council report also documents a systemic issue in the United States' prioritization of all structures, whereby outbuildings and unoccupied vacation homes, are prioritized over trust resources.  This prioritization resulted in resources initially allocated to the North Star and Tunk Block fires and protection of the Colville Reservation to be moved to off-Reservation areas to protect unoccupied structures.  The United States breached its

fiduciary duties to the Tribes by prioritizing off-Reservation structures and other non-trust property over forest resources held in trust by the United States when allocating suppression resources.

94.     The United States' breaches of trust relating to fire suppression also occurred with fires subsequent to the North Star and Tunk Block fires.  The United States' breaches of trust increased the opportunity for, and the size, severity, and intensity of, the North Star, Tunk Block, and subsequent fires, with resulting damages to the Tribes.

*The United States Breached Its Fiduciary Duties Relating to Forest Rehabilitation*

95.     While the North Star and Tunk Block fires were still burning, the Secretary of the Interior toured the fire activity and met with Tribal officials on the Colville Reservation on September 7, 2015. On September 11, 2015, a delegation from the Colville Tribes met with Interior officials in Washington, D.C. to discuss anticipated rehabilitation and restoration funding needs.

96.     In a September 30, 2015, letter to the Secretary of the Interior, the Colville Tribes requested a minimum of $36.78 million that it preliminarily estimated would be needed for restoration activities from the North Star and Tunk Block fires.  Citing the Secretary's duties under NIFRMA, the Tribes requested, among other things, that the Department reprogram or transfer existing Departmental funds for these purposes.  To the extent existing funds were not available, the Tribes alternatively requested that the Department affirmatively request sufficient funds to fully address the aftermath of the fires on the Colville Reservation and other Indian reservations in the Pacific Northwest from Congress.

97.     The Department neither provided the funds the Colville Tribes requested from existing sources nor made efforts to secure them.  The Tribes would later learn that the

Department, in considering the Tribes' alternative request, decided to prioritize securing additional funding for Sage-Grouse habitat for other federal lands instead of seeking restoration and rehabilitation funds for the Colville Tribes' and other tribes' burned forests.

98.     Following the devastating North Star and Tunk Block fires, the United States failed to ensure the return of the Tribes' forests to a productive state.

99.     The United States failed to restore damaged roads, control soil erosion, conduct mulching and seeding, clean and repair culverts, and conduct replanting.

100.    A team of experts prepared a Burned Area Emergency Response ("BAER") report.  The United States failed to implement the BAER report.

101.    A team of experts prepared the North Star Fire Burned Area Emergency Stabilization and Rehabilitation Assessment and Suppression Specifications Plan (collectively, "BAER Plan").  The United States failed to implement the BAER Plan.

102.    For example, the BAER Plan calls for extensive road restoration and maintenance, at 109-14, post-fire treatment of noxious and invasive weeds, at 134-35, and planting of 6,533,600 ponderosa pine and western larch seedlings across 32,688 acres and associated gathering of cones and nursery production.  *See* BAER Plan at 144-45.  The United States did not provide adequate funding and resources for these efforts.

103.    The United States' breaches of trust relating to forest rehabilitation delayed the development of commercially valuable timber, and harmed wildlife, fisheries, and other cultural resources.

*Damages*

104.    The Reservation is the Tribes' permanent homeland, which the Tribes rely upon to sustain the economy, the Tribes' culture and traditions, and the Tribal members' lifeways.

105. As set forth above, the United States' breaches of trust regarding forest, road, and related trust assets caused extensive and ongoing damage to the Tribes. For example, the Tribes have lost valuable commercial timber that would otherwise have been harvested. Where salvage logging was possible, the value returned was far less than would have been achieved from green tree harvest. The United States' breaches of trust also resulted in fires burning developing stands that would have been harvested in coming years and decades. Damages to soils extended the time needed to regrow commercial stands, particularly where restoration efforts are insufficient, which delayed future commercial timber harvest. Some lands may never be recovered.

106. United States' breaches of trust caused extensive and ongoing damage to cultural resources, forest roads, and air and water quality. In addition to the damages suffered at the time of the fires in mid-August 2015 to present, vast acreage of the Reservation has been reduced to severely burnt standing and fallen timber with highly erodible soils. These conditions create continuing harm to native plants, wildlife habitat, water quality, and fisheries.

107. Catastrophic wildfires, including the North Star and Tunk Block fires and subsequent fires, have also caused damage to air quality from smoke and particulates, with resulting harm to the Tribes and their members.

## CLAIM I: BREACH OF TRUST BY MISMANAGEMENT OF FOREST, ROAD, and RELATED TRUST ASSETS

1. The Tribes realleges and incorporates by reference the allegations contained in paragraphs 1 through 107 above.

2. The United States possessed and exercised comprehensive authority, control, and supervision over the Tribes' forest trust assets, including without limitation its land and timber.

3.      Under 25 U.S.C. § 3101 *et seq.*, and other statutes, regulations, and law applicable to forest Tribal trust assets, the Government has fiduciary duties as trustee to manage those assets on the Colville Reservation.

4.      The Government breached its fiduciary duties in managing the Tribes' forest trust assets, causing economic loss to the Tribes.

5.      As a result of the Government's breaches of its fiduciary duties, the Tribes have been damaged in an amount to be determined at trial.

<u>PRAYER FOR RELIEF</u>

WHEREFORE, the Tribes respectfully requests that the Court:

1.      Award the Tribes monetary damages in an amount to be determined by the Court at trial which will compensate the Tribes for the injuries and losses caused through violations of the United States' fiduciary and statutory responsibilities set out above, including interest as required by law;

2.      Award the Tribes its costs and attorney's fees incurred herein under 28 U.S.C. § 2412 and any other applicable law; and

3.      Award such other relief as the Court deems just and equitable.

Dated this 4th day of August, 2021.

Respectfully submitted,

s/Brian W. Chestnut
Brian W. Chestnut
ZIONTZ CHESTNUT
2101 4th Avenue, Suite 1230
Seattle, WA 98121
Tel. (206) 448-1230
Fax (206) 448-0962
bchestnut@ziontzchestnut.com
*Attorney of Record for Plaintiff*

*Of Counsel*:
Wyatt Golding
ZIONTZ CHESTNUT
2101 4th Avenue, Suite 1230
Seattle, WA 98121
Tel. (206) 448-1230
Fax (206) 448-0962
wgolding@ziontzchestnut.com


*Of Counsel:*
Brian Gunn
Powers Pyles Sutter & Verville PC
1501 M Street, NW
Seventh Floor
Washington, DC 20005
Tel: (202) 466-6550
Fax: (202) 785-1756
brian.gunn@powerslaw.com